UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

E.L.A. and O.L.C.,

    Plaintiffs,

v.

UNITED STATES OF AMERICA,

    Defendant.

Case No. 2:20-cv-1524

**COMPLAINT**

## INTRODUCTION

1. This case is about the unprecedented policy issued at the highest levels of the federal government to separate asylum-seeking parents and children. The government's policy of forcibly taking children from their parents caused extraordinary trauma to thousands of families, including Plaintiffs E.L.A. and his son O.L.C, whom the United States government forcibly separated for nine months.[1] The trauma that Plaintiffs and other parents and children suffered was not an incidental byproduct of the policy. It was the very point. The government *sought* to inflict extreme emotional distress and other harms in order to deter parents and children from

---

[1] Consecutive with this Complaint, Plaintiffs will file a motion for leave to proceed under pseudonyms to protect their identities from public disclosure due to the trauma inflicted upon them. Plaintiffs have already disclosed their full names to the relevant government agencies in their administrative claims filed in accordance with 28 U.S.C. § 3401(b).

COMPLAINT – 1
Case No. 2:20-cv-1524

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

seeking asylum in this country.

2. The government intended to use the trauma resulting from family separations, and media reporting about that trauma, to deter future asylum seekers. Federal officials at the highest levels repeatedly made public statements acknowledging that this was the policy's purpose. Despite widespread condemnation and a federal court injunction requiring the government to reunite separated families and stop further separations, President Trump defended the policy as a deterrent to migration from Central America. Even months after a federal court had ordered an end to the policy, the President stated on Twitter that "if you don't separate, FAR more people will come." Donald J. Trump (@realdonaldtrump), Twitter (Dec. 16, 2018, 11:25 a.m.), https://twitter.com/realDonaldTrump/status/1074339834351759363.

3. Plaintiffs' claims concern the entirely predictable—and, in fact, actually desired—harms caused by Defendant's unprecedented conduct in systematically separating asylum-seeking parents and children. Defendant's employees forcibly separated Plaintiffs after they entered the United States in June 2018 and unlawfully refused to process E.L.A.'s request for asylum. Defendant's employees detained Plaintiffs in separate facilities thousands of miles apart by detaining E.L.A. in Texas and forcibly transferring O.L.C. to Lincoln Hall Boys Haven (Lincoln Hall) in Lincolndale, New York. For more than a week, Plaintiffs did not even know each other's whereabouts, much less when—or if—they would see each other again.

4. In July 2018, after a month of separation, U.S. government officials told E.L.A. that he was about to be reunited with his son, but this was a cruel ruse. Instead of taking him to be reunited with O.L.C., officials instead took him to an airport and unlawfully deported E.L.A. to Guatemala.

5. Alone in the United States, O.L.C. remained detained in the custody of the Office of Refugee Resettlement (ORR) from June 2018 until March 2019. In addition to the harm of

COMPLAINT – 2
Case No. 2:20-cv-1524

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

being separated from his father, O.L.C. suffered numerous harms in the hostile and abusive environment at Lincoln Hall, many of which were reported to ORR. Among other things, two different Lincoln Hall staff members showed O.L.C. pornographic videos; a staff member followed O.L.C. into a bathroom and was alone with him for an extended period of time, during which he suffered what a later report called a "groin injury"; and another staff member exposed him to a photo of herself without clothes. Defendant's other agents at Lincoln Hall were physically abusive and insulting, medicated O.L.C. without parental consent, and placed him in isolation for nearly a month and a half.

6. Plaintiffs were reunited in March 2019 only because of court intervention in another case, and only after *nine months* of enduring forced separation.

7. Plaintiffs suffered significant physical and emotional harm as a direct result of Defendant's unlawful conduct and violation of Plaintiffs' constitutional and statutory rights.

8. Defendant is liable for this conduct under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671 et seq. (FTCA).

9. Plaintiffs bring this action under the FTCA seeking compensation for the extraordinary harms they suffered at the hands of the federal government.

**JURISDICTION & VENUE**

10. This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. §§ 1331 (federal question), 1346(b) (United States as defendant).

11. On October 10, 2019, Plaintiffs submitted a Notification of Incident and Claim for Damages Under the Federal Tort Claims Act to each agency Defendant. Each Plaintiff also completed Standard Form 95 and provided a detailed description of the basis of his claim.

12. Defendant has not responded, much less made a final disposition of Plaintiffs' administrative claims.

COMPLAINT – 3
Case No. 2:20-cv-1524

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

13. Because Defendant failed to make a final disposition of Plaintiffs' claims within six months, Plaintiffs' claims are deemed finally denied. *See* 28 U.S.C. § 2675(a). Accordingly, Plaintiffs have exhausted all potential administrative remedies.

14. Venue is proper in the Western District of Washington under 28 U.S.C. § 1402(b) because Plaintiffs reside in this District.

## PARTIES

15. Plaintiff E.L.A. is an indigenous Mayan and a citizen of Guatemala. Fearing persecution and torture, E.L.A. fled Guatemala with his son, O.L.C., and sought refuge in the United States.

16. Plaintiff O.L.C. is an indigenous Mayan and a citizen of Guatemala. With his father, E.L.A., O.L.C. fled persecution and torture in his home country and sought refuge in the United States. O.L.C. was seventeen years old at the time of the forced separation described in this Complaint, and was a minor at all times that Defendant's employees detained him.

17. E.L.A. and O.L.C. are presently seeking asylum in the United States. The family currently resides in the Western District of Washington.

18. The United States of America has waived sovereign immunity as to claims under the FTCA and is properly named as a defendant to each of Plaintiffs' claims under the Act. 28 U.S.C. § 2679(a).

## FACTUAL ALLEGATIONS

**A. Defendant's Employees Forcibly Separated Plaintiffs When They Sought Asylum in the United States.**

19. E.L.A. and O.L.C. are part of an indigenous Maya people native to southeastern Guatemala and western Honduras. E.L.A. is a political activist who received death threats due to his advocacy for indigenous land rights. Plaintiffs fled persecution and torture in Guatemala to

COMPLAINT – 4
Case No. 2:20-cv-1524

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

seek asylum in the United States.

20. Plaintiffs entered the United States on or about June 18, 2018, near McAllen, Texas. U.S. Customs and Border Protection (CBP) officers questioned and arrested Plaintiffs shortly after they crossed the border, confiscated their shoelaces and belts, and loaded Plaintiffs into a van without offering them food or water.

21. After the arrest, immigration officers took Plaintiffs to a CBP facility known as a "*hielera*," or "ice box," because of its cold temperatures. Immigration officers forcibly separated Plaintiffs almost immediately after they arrived at the *hielera*. Without explanation, and over Plaintiffs' desperate objections, immigration officers physically separated E.L.A.—who was handcuffed—and O.L.C., a minor.

22. While officers forcibly separated O.L.C. and E.L.A., O.L.C. wept and tried to cling to his father. E.L.A. begged the officers not to take his son away from him, but they ignored him. Defendant's employees did not give E.L.A. and O.L.C. the chance to hug, kiss, or even say goodbye before taking O.L.C. away. E.L.A. recalls the fear etched on O.L.C.'s face and the sound of his screams. E.L.A. describes this forcible separation from his son as the worst moment of his life.

23. E.L.A. and O.L.C. would not see each other again for nine months.

24. E.L.A. cried many times in detention after his son was taken away. E.L.A. continuously questioned the immigration officers at the *hielera* about O.L.C.'s location and asked when he could see his son again. The officers refused to answer his questions.

**B. Defendant's Employees Subjected E.L.A. to Inhumane Detention Conditions.**

25. Immigration officers detained E.L.A. in the *hielera* for several days. When E.L.A. was taken into the *hielera* after he was separated from O.L.C., immigration officials interviewed him—without counsel—for about fifteen minutes. The officials took fingerprints and photos.

COMPLAINT – 5
Case No. 2:20-cv-1524

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

E.L.A. gave the immigration officials his identification and O.L.C.'s birth certificate. He indicated a desire for asylum and said that he was afraid to return to Guatemala. However, the immigration officials in the *hielera* did not refer E.L.A. for a credible fear interview as required by law.

26.     E.L.A. experienced temperatures in the *hielera* similar to the bitter cold of Guatemala's mountains. When E.L.A. or other fathers asked where their children were, immigration officers would punish them by turning up the air conditioning to make the cells even colder. When the questions ceased, immigration officers decreased the air conditioning.

27.     Apart from the cold, the *hielera* was cramped, dirty, and uncomfortable. Immigration officials packed approximately fifteen adult men into a ten foot by five foot cell. The cell contained no beds or access to drinking water—just two benches, a table, and a shared single toilet without any privacy. E.L.A. ate, slept, and drank there. Immigration officials did not permit E.L.A. to brush his teeth, shower, or change clothes during the several days they detained him in the *hielera*. Instead, E.L.A. was forced to wear the dirty clothes that he had worn while crossing the border. Because none of the other men were permitted to shower or brush their teeth either, the smell in the *hielera* was horrible.

28.     The immigration officers at the *hielera* also did not provide E.L.A. with sufficient food or water. The only water available to E.L.A. was in the bathroom area where the detainees washed their hands and used the toilet, and the only food was a simple sandwich and juice box twice per day. While handing E.L.A. his food, an immigration officer taunted him by saying: "this is what you wanted when you came to the United States."

29.     Immigration officials locked E.L.A. in the cell 24 hours per day, with no access to natural light or exercise. The cell was flooded with bright fluorescent light 24 hours a day, and E.L.A. was unable to tell if it was day or night. He estimates that he slept one or two hours per

COMPLAINT – 6
Case No. 2:20-cv-1524

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

day while curled up on the concrete floor with only an aluminum foil blanket to serve as a cover. The immigration officials did not provide sleeping mats, blankets, or pillows. The cell was so cramped that E.L.A. could not straighten his legs. When E.L.A. did manage to sleep, CBP officers roused him frequently by conducting a roll call. The immigration officers conducted a roll call every few hours, 24 hours a day, and required E.L.A. to respond when his name was called. The lack of sleep was psychological torture that only compounded E.L.A.'s distress caused by his forced separation from O.L.C.

30. E.L.A.'s mood in the cell was desperate and fearful. He was surrounded by the constant sound of adult men sobbing and begging immigration officers to let them see their children. Fathers grabbed the metal bars of the cells and banged their heads against them, pleading for information about their children's location. E.L.A. begged immigration officers to tell him where O.L.C. was detained, but the immigration officers ignored him.

31. After a few days in the *hielera*, immigration officials transported E.L.A. to a federal courthouse, where he was convicted of illegal entry into the United States under 8 U.S.C. § 1325. E.L.A. was humiliated by the experience because he did not believe that he was a criminal for seeking asylum under U.S. law.

**C. Defendant's Employees Improperly Used a Federal Prosecution to Justify E.L.A.'s Separation from O.L.C.**

32. E.L.A.'s prosecution under 8 U.S.C. § 1325 was part of a policy launched by the Department of Justice on April 6, 2018. That day, then-Attorney General Jeff Sessions publicly announced a "Zero Tolerance" directive to all U.S. Attorneys along the southern border, including in Texas, to prosecute anyone who committed the misdemeanor offense of unlawful entry or re-entry in violation of 8 U.S.C. § 1325(a). Previously, asylum seekers, especially families, had not been systematically referred for prosecution for the misdemeanor of crossing

COMPLAINT – 7
Case No. 2:20-cv-1524

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

the border illegally. Over the last 20 years, less than one-third of apprehensions by CBP have resulted in criminal prosecutions, and any sentences imposed tended to be short, ranging from two to 15 days.

33. The "Zero Tolerance" announcement was conceived of, upon information and belief, by Attorney General Sessions, Department of Homeland Security (DHS) Secretary Kristjen Nielsen, and White House adviser Stephen Miller, among others.

34. The policy served as a pretext or cover for the goal of furthering the widespread separation of Central American parents and children along the southern border. Indeed, Secretary Nielsen later admitted under oath before the House Homeland Security Committee that she had discussed imposing widespread family separations with Sessions prior to the "Zero Tolerance" announcement.

35. Consistent with the "Zero Tolerance" policy, U.S. government officials began routinely prosecuting parents who crossed the border illegally. Parents convicted under "Zero Tolerance" usually received a sentence of time served that amounted to, at most, a few days in jail, after which the parent would be returned to immigration custody. In fact in many cases, like this one, the target of the "Zero Tolerance" policy did not serve *any* time in jail, but instead remained in CBP or ICE custody. Nonetheless, children were taken away during this brief period, often flown across the country, and not returned to the parent—even where the parent was sentenced to time served.

36. The government officials who formulated the "Zero Tolerance" policy knew or reasonably expected that parents who unlawfully entered the United States with children and were prosecuted under this policy would serve either little or no jail time. They also knew or reasonably expected that this policy and the prosecutions under 8 U.S.C. § 1325 taken pursuant to the policy would result in the separation of children from their parents. As a result, they knew

COMPLAINT – 8
Case No. 2:20-cv-1524

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

or reasonably expected that a parent's prosecution would provide no real justification for a parent's days, weeks, or months-long separation from their child.

37. As with many Zero Tolerance prosecutions under 8 U.S.C. § 1325(a)(1), E.L.A. was sentenced to time served and a $10 fine. He never entered the custody of the Bureau of Prisons (BOP), and other than his brief appearance in the courthouse, E.L.A. was in DHS custody at all times.

38. E.L.A.'s court hearing for his illegal entry took a matter of hours. However, despite never entering BOP custody and having only a single, brief court appearance, CBP and Immigration and Customs Enforcement (ICE) used E.L.A.'s federal court proceedings and prison sentence to designate O.L.C. an "unaccompanied minor." *See* 8 U.S.C. § 1232(b)(1); 6 U.S.C. § 279(b).

39. As a result of that designation, ICE and CBP treated O.L.C. as if he were legally in the custody of ORR. ICE and CBP made that determination even though E.L.A. and O.L.C. entered the country together, were initially in immigration custody together, and E.L.A. was never held in a non-immigration detention facility except for the few hours he spent on one occasion in federal court.

40. When Defendant's employees separated E.L.A. and O.L.C. they knew, or, at a minimum, reasonably expected, that E.L.A. would not be held in BOP custody or that he would be put in custody for only a matter of a few days. Accordingly, there was no reason to send O.L.C. to a facility thousands of miles away.

**D. Defendant's Employees Denied E.L.A. the Right to Seek Asylum and Deported Him in Violation of the INA and a Federal Court Order.**

41. After days in the *hielera*, immigration officers transferred E.L.A. to a detention center in Port Isabel, Texas. In Port Isabel, E.L.A. was again detained in a cell with other fathers

COMPLAINT – 9
Case No. 2:20-cv-1524

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

who had been separated from their children. When E.L.A. asked about seeing his child, immigration officers told him to be quiet.

42.     A day or two after his arrival at the Port Isabel detention center, E.L.A. finally learned that Defendant's employees had taken O.L.C. to New York. At that point, he had not known his son's whereabouts for more than one week. E.L.A. and O.L.C. spoke briefly by phone two times while they were detained in Port Isabel and New York, respectively. E.L.A. was devastated that his son was so far away. Hope briefly returned to E.L.A. when, after approximately a month of separation from O.L.C., immigration officers told E.L.A. that he was going to be reunited with his son the following day. E.L.A. was happy and hopeful.

43.     The next morning, immigration officers put E.L.A. on a bus with other fathers who had been separated from their children. Instead of reuniting E.L.A. with his son, immigration officers took E.L.A. and the other fathers to an airport. The officers then restrained E.L.A. in chains and loaded him onto a plane. At this point, E.L.A. realized that the officers had deceived him. Despite their promise to reunite E.L.A. with his son, and despite his request for asylum, the officers deported E.L.A. to Guatemala. Defendant's deportation of E.L.A. was a violation of both the asylum provisions of the Immigration and Nationalization Act, *see, e.g.*, 8 U.S.C. § 1158, and a federal court order in *Ms. L. v. U.S. Immigration and Customs Enforcement*, Case No. 18-cv-428 (S.D. Cal.), requiring the family's reunification.

44.     E.L.A.'s Guatemalan persecutors soon learned that he had returned to Guatemala, and tried to kill him. Fearing for his life and desperately hoping to be reunited with his son O.L.C., E.L.A. fled to Guatemala City, where he connected with a nonprofit organization that facilitated his return to the United States pursuant to the federal district court's order in the *Ms. L.* litigation.

45.     On or about March 2, 2019, E.L.A. presented himself at the Calexico West Port of

COMPLAINT – 10
Case No. 2:20-cv-1524

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

Entry in Calexico, California and was admitted pursuant to the federal court's order.

46.     Plaintiffs were finally reunited in Seattle, Washington in March 2019 after nine months of forced separation.

47.     In May 2019, E.L.A. was finally able to apply for asylum with the help of *pro bono* counsel. E.L.A.'s asylum application included his son, O.L.C., as a derivative applicant.

### E. O.L.C. Was Abused While in Detention.

48.     After immigration officers forcibly separated O.L.C. from his father on June 18, 2018, they detained O.L.C. for another for a few hours in the *hielera*. Defendant's employees then transferred O.L.C. to a facility for unaccompanied children in Texas. The immigration officers did not tell O.L.C. the name of the Texas detention center or its location.

49.     Inside the detention center, there was one large room divided into cells by chain-link fences. There were teenage boys in O.L.C.'s cell, but he could see smaller children and babies in nearby cells, many of whom cried loudly. O.L.C. was sad, confused, and overwhelmed. He was also hungry. At various points during his detention, immigration officials at the Texas facility gave O.L.C. a sandwich or burrito, but he was not accustomed to those types of food and could not eat them. O.L.C. struggled to sleep in the facility because it was flooded with bright fluorescent lights 24 hours per day. There were also no windows, and O.L.C. could only tell if it was night or day through cracks in the ceiling around the air conditioning units.

50.     After approximately two days, Defendant's employees put O.L.C. on a plane and flew him to New York. O.L.C. arrived at Lincoln Hall Boys Haven in Lincolndale, New York, on or about June 20, 2018.

51.     Lincoln Hall is associated with Catholic Charities of the Archdiocese of New York and contracts with ORR to provide services to unaccompanied minors.

52.     Because DHS and ICE designated O.L.C. an unaccompanied minor, ORR was

COMPLAINT – 11
Case No. 2:20-cv-1524

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

charged by law with "coordinating and implementing the care and placement" of O.L.C. 6 U.S.C. § 279(b)(1); *see also* 8 U.S.C. § 1232(b)(1) ("[T]he care and custody of all unaccompanied [noncitizen] children . . . shall be the responsibility of the Secretary of Health and Human Services."). ORR thus remained legally responsible for O.L.C.'s adequate care and safety after it placed him in Lincoln Hall's care.

53. In addition, ORR was charged with ensuring that O.L.C. did not become the victim of sexual abuse while at Lincoln Hall. Under 45 C.F.R. §§ 411.71-411.72, ORR is obligated to monitor and evaluate reports of sexual abuse at places like Lincoln Hall, and to take corrective action when necessary.

54. As detailed below, ORR failed to fulfill its statutory and regulatory obligations in this case.

55. After his separation from E.L.A., O.L.C. did not know where his father was for more than a week, until he finally learned that his father was still detained in Texas. O.L.C. spoke with his father by phone only twice while they were both detained in the United States. O.L.C. cried during the calls.

56. On or about July 17, 2018, Lincoln Hall staff recommended that O.L.C. be released from custody and reunified with his father. A few days later, however, government agents made this impossible when they unlawfully removed E.L.A. to Guatemala, leaving O.L.C. alone in the United States without a parent or viable options for family reunification.

57. Although he was not able to tell his father, O.L.C. was already being abused by Lincoln Hall staff.

58. As detailed below, ORR received several Significant Incident Reports (SIRs) documenting the abuse that O.L.C. experienced while at Lincoln Hall. Nevertheless, ORR failed to take any action to protect O.L.C. or remedy the abuse that he experienced.

COMPLAINT – 12
Case No. 2:20-cv-1524

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

### 1. Abusive and sexualized environment: first sexual abuse Serious Incident Report.

59. Lincoln Hall staff created an abusive and sexualized environment while O.L.C. was forced to live there. On at least two separate occasions, Lincoln Hall staff completed an ORR SIR entitled "Sexual Abuse SIR" describing incidents that involved O.L.C.

60. ORR took no action in response to these reports to remedy the abuse that O.L.C. faced.

61. On or around July 13, 2018, shortly after his arrival, a male Lincoln Hall staff member ("Staff Member A")[2] showed O.L.C. and the other boys in his room a pornographic video on a cell phone. The incident occurred in a Lincoln Hall sleeping room where O.L.C. slept with eleven other boys.

62. Later that day, a female staff member ("Staff Member B") escorted several boys to the bathroom. At Lincoln Hall, the boys needed permission to go to the bathroom and had to be accompanied by a staff member, who usually waited outside of the bathroom entrance until the boys came out. On this occasion, however, Staff Member B followed the boys into the bathroom. After the other boys exited the bathroom, Staff Member B remained alone in the bathroom with O.L.C. for approximately ten to fifteen minutes. During this time, Staff Member B showed O.L.C. pornography on her cell phone.

63. The following day, a boy in O.L.C.'s room reported to his counselor that Lincoln Hall staff had shown the boys pornography on a cell phone. As part of a subsequent investigation, Lincoln Hall staff reportedly reviewed surveillance video footage from that night.

---

[2] Given the serious and sensitive nature of the abuse experienced by O.L.C., this Complaint will refer to Lincoln Hall staff members using pseudonyms. Plaintiffs will separately provide available identifying information to Defendant.

COMPLAINT – 13
Case No. 2:20-cv-1524

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

The surveillance video footage confirmed that Staff Member A had exposed the boys to the pornographic video.

64. Lincoln Hall staff took O.L.C. to the medical clinic, where he was examined for sexual abuse, and diagnosed with what the "Sexual Abuse SIR" describes as "an accidental[] injury to his groin." Lincoln Hall staff and attorneys from Catholic Charities interviewed O.L.C., and Lincoln Hall staff completed an ORR SIR identifying Staff Member B as a "perpetrator," and O.L.C. as a "victim." That report indicates that Lincoln Hall staff did not report this offense to either law enforcement or the Department of Justice.

**2.  O.L.C. was medicated without parental consent and placed in isolation.**

65. After many months of detention and separation from his family, O.L.C. felt overwhelmed by feelings of hopelessness. O.L.C. felt angry, sad, and desperate. Watching many other boys enter Lincoln Hall and then leave to be reunified with their families or friends made him feel even more alone.

66. On or around February 6, 2019, O.L.C. told his counselor that he did not feel well and threatened to run away from Lincoln Hall. The clinician's report indicates that this incident was likely reported to ORR by the filing of a SIR.

67. In response, the counselor sent O.L.C. to the medical clinic, where the staff prescribed O.L.C. a white pill to take every evening. O.L.C. does not remember being told the name of the pill, but he recalls that staff said that the pill would calm him. O.L.C. did as he was told and took the pill each night.

68. Lincoln Hall medical clinic staff stopped giving O.L.C. the pills after approximately 1.5 months, but only after he apologized for threatening to run away and said that he would stay at Lincoln Hall. The Lincoln Hall medical staff did not obtain parental consent or even contact E.L.A. prior to medicating O.L.C.

COMPLAINT – 14
Case No. 2:20-cv-1524

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

69.     In addition to medicating him, Lincoln Hall staff placed O.L.C. in isolation, dubbed the "one-on-one" program, after he threatened to run away.

70.     At the time that O.L.C. told staff that he wanted to run away, he had already languished in Lincoln Hall for several months—much longer than nearly all the other boys detained at the facility with him. While in the "one-on-one" program, Lincoln Hall staff guarded O.L.C. at all times. He was not permitted to go to school and instead sat in a classroom with Lincoln Hall staff. However, there was little or no instruction or teaching in the one-on-one program's classroom. Instead, O.L.C. often watched cartoons and sometimes played card games with Lincoln Hall staff.

71.     On some occasions, one or two other boys who were also in the "one on one" program were in the classroom, but O.L.C. was not allowed to talk to them. During his time in the program, O.L.C. slept in a small room with one or two other boys. Lincoln Hall staff routinely checked on the boys throughout the night.

**3.  Lincoln Hall staff subjected O.L.C. to physical harm and insults.**

72.     Around the same time that Lincoln Hall staff began medicating O.L.C., a Spanish-speaking male staff member ("Staff Member C") physically assaulted O.L.C. and verbally castigated him. One day, after taking his shower, O.L.C. started walking to his room. Staff Member C said, "Where are you going? I'll tell you when you can leave." He then put his hand on O.L.C.'s chest, and pushed him back towards the showers. On another occasion, Staff Member C cursed at O.L.C.

73.     Although O.L.C. told other Lincoln Hall staff that Staff Member C had mistreated him, they told O.L.C. that they could not do anything to protect him. O.L.C. also told his counselor about the mistreatment. The counselor said that he would consult with a supervisor. Ultimately, rather than intervening to protect O.L.C., Lincoln Hall staff instead sent O.L.C. to a

COMPLAINT – 15
Case No. 2:20-cv-1524

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

different area of Lincoln Hall where he was less likely to encounter Staff Member C. No other actions were ever taken to ensure O.L.C.'s safety or wellbeing while in custody.

### 4. Abusive and sexualized environment: second sexual abuse Serious Incident Report.

74. On or around February 21, 2019, O.L.C. and two other boys were in the "one-on-one" program's classroom under the supervision of a female Lincoln Hall staff member ("Staff Member D"). At the end of the day, the other boys walked out of the classroom and O.L.C. stayed behind to put on his jacket. Another Lincoln Hall staff member ("Staff Member E") stayed behind to close the blinds. As Staff Member D followed the other boys out of the room, she appeared to drop a photo. When O.L.C. picked up the photo, he discovered that it was a photo of Staff Member D unclothed. Unsure what to do, O.L.C. put the photo in his jacket.

75. Lincoln Hall staff and the authorities initiated an investigation on February 25, 2019. (O.L.C. believes that another staff member, Staff Member E, saw O.L.C. pick up the photo and reported it to a supervisor.) A Lincoln Hall staff supervisor, as well as unknown "immigration officials" wearing blue uniforms, interviewed O.L.C. O.L.C. was in the "one-on-one" program for about eight more days after being exposed to the photo. He was finally allowed to exit the "one-on-one" program after apologizing for threatening to run away and promising to stay at Lincoln Hall.

### F.  Defendant's Conduct Harmed Plaintiffs.

76. As a direct result of the U.S. government's actions, Plaintiffs suffered significant physical and emotional harm.

77. E.L.A. lost eight pounds in a single month of detention, and he suffers from depression, anxiety, and nightmares to this day. He feels anxious when O.L.C. is not nearby, and fears that his family will be separated again.

COMPLAINT – 16
Case No. 2:20-cv-1524

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

78. O.L.C. also suffers from severe anxiety and depression. As with his father, Defendant's employees wreaked lasting emotional trauma on O.L.C. by forcibly separating him from his father for nine months.

79. O.L.C. suffered additional emotional and physical abuse while detained in ORR custody. Instead of caring for a vulnerable child who had been separated from his father, ORR allowed Lincoln Hall staff to expose O.L.C. to sexually explicit material, physically accost him, and medicate him without his parents' consent. O.L.C. fears that he could be separated again from his family at any moment.

80. Finally, the immigration officers' actions offended Plaintiffs' rights to family integrity, their dignity, and their sense of belonging. Despite finally reaching the United States—which has statutorily committed itself to providing asylum to qualified refugees—immigration officers treated Plaintiffs as people without rights and without a voice. They ignored E.L.A.'s valid and well-supported fear of returning to Guatemala, and—through forced separation and detention—punished E.L.A. and O.L.C. for seeking safety in the United States.

81. Defendant's employees forcibly separated Plaintiffs as part of an unprecedented government practice and policy of forced family separation. Defendant's employees did so in disregard for Plaintiffs' statutory and constitutional rights, their dignity as persons, and their love for one another as a family. Plaintiffs suffered and continue to suffer significant emotional trauma as a consequence of their forced separation by the concerted efforts of Defendant's employees.

82. That separation, and the other wrongful acts that federal officers and their agents inflicted upon Plaintiffs, results in Defendant's employees being liable to Plaintiffs under the FTCA and relevant state law.

COMPLAINT – 17
Case No. 2:20-cv-1524

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

# CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

83. Plaintiffs reallege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

84. Defendant's employees acted intentionally and/or recklessly through their implementation of an unprecedented government policy of forced separation.

85. Defendant's employees engaged in conduct that was extreme and outrageous.

86. Defendant's employees engaged in conduct that caused Plaintiffs severe emotional distress.

87. Under the FTCA, Defendant is liable to Plaintiffs for intentional infliction of emotional distress.

## SECOND CLAIM FOR RELIEF

### ABUSE OF PROCESS

88. Plaintiffs reallege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

89. Defendant's employees abused legal processes within their control when they used the prosecution under 8 U.S.C. § 1325 against E.L.A. in order to designate O.L.C. an unaccompanied minor.

90. Defendant's employees improperly made the unaccompanied minor designation, relying on E.L.A.'s prosecution under 8 U.S.C. § 1325 to justify the separation of E.L.A. and O.L.C. and to traumatize E.L.A. and O.L.C.

91. Defendant's employees' abuse of process caused Plaintiffs severe harm, including emotional distress.

COMPLAINT – 18
Case No. 2:20-cv-1524

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

92. Under the FTCA, Defendant is liable to Plaintiffs for abuse of process.

## THIRD CLAIM FOR RELIEF

### NEGLIGENCE – FAMILY SEPARATION

93. Plaintiffs reallege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

94. Defendant's employees had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs.

95. Defendant's employees failed to act with ordinary care and breached their duty of care owed to Plaintiffs.

96. As a direct and proximate result of the conduct described in this Complaint, Plaintiffs suffered substantial damages.

97. Under the FTCA, Defendant is liable to Plaintiffs for negligence.

## FOURTH CLAIM FOR RELIEF

### NEGLIGENCE – O.L.C.'S TIME IN ORR CUSTODY

98. Plaintiffs reallege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

99. Defendant's employees had a duty to Plaintiff to act with ordinary care and prudence so as not to cause harm or injury to Plaintiff O.L.C. while he was in the custody of Lincoln Hall.

100. Defendant's employees failed to act with ordinary care and breached their duty of care owed to Plaintiff O.L.C.

101. As a direct and proximate result of the conduct described in this Complaint, O.L.C. suffered substantial damages.

102. Under the FTCA, Defendant is liable to Plaintiff O.L.C. for negligence.

COMPLAINT – 19
Case No. 2:20-cv-1524

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. Compensatory damages in the amount of $3,000,000 for harm to E.L.A. resulting from Defendant's conduct;

B. Compensatory damages in the amount of $3,000,000 for harm to O.L.C. resulting from Defendant's conduct; and

C. Such other and further relief as the Court deems just and appropriate, including all equitable relief to which Plaintiffs are entitled.

DATED this 15th day of October, 2020.

Respectfully submitted,

| | |
|---|---|
| *s/ Matt Adams* <br> Matt Adams, WSBA No. 28287 <br> *s/ Aaron Korthuis* <br> Aaron Korthuis, WSBA No. 53974 <br> **NORTHWEST IMMIGRANT RIGHTS PROJECT** <br> 615 Second Avenue, Suite 400 <br> Seattle, Washington 98104 <br> Tel: +1.206.957.8611 <br> Fax: +1.206.587.4025 <br> matt@nwirp.org <br> aaron@nwirp.org | *s/ Susan Baker Manning* <br> **MORGAN, LEWIS & BOCKIUS LLP** <br> Susan Baker Manning* <br> 1111 Pennsylvania Avenue NW <br> Washington, D.C. 20004 <br> Tel: +1.202.739.3000 <br> Fax: +1.202.739.3001 <br> susan.manning@morganlewis.com <br><br> Elizabeth M. Chiaviello* <br> Nicholaus E. Floyd* <br> **MORGAN, LEWIS & BOCKIUS LLP** <br> 1000 Louisiana Street, Suite 4000 <br> Houston, Texas 77002 <br> Tel: +1.713.890.5000 <br> Fax: +1.713.890.5001 <br> elizabeth.chiaviello@morganlewis.com <br> nicholaus.floyd@morganlewis.com <br><br> * *Pro hac vice* application forthcoming <br><br> *Counsel for Plaintiffs E.L.A. and O.L.C.* |